UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| R.S. and M.S., o/b/o D.S., | : | CIVIL ACTION NO. 10-4215 (MLC) |
| Plaintiffs, | : | **MEMORANDUM OPINION** |
| v. | : |  |
| SOMERVILLE BOARD OF EDUCATION, | : |  |
| Defendant. | : |  |

**COOPER, District Judge**

This case arises under the Individuals with Disabilities Education Act ("IDEA" or "the Act"), 20 U.S.C. § 1400, et seq., and specifically under its "stay put" provision, 20 U.S.C. § 1415(j). Plaintiffs bring this action on behalf of their son, who is a student receiving educational and support services under the Act. Defendant is the regional school district. Plaintiffs are before this Court on interlocutory appeal from a recent stay put placement decision in an ongoing administrative process pending in the New Jersey Office of Administrative Law ("OAL").

The facts relevant to this appeal are undisputed, but the circumstances are unusual. We have reviewed the pertinent record and conducted oral argument. For the reasons stated here, we reverse the current OAL stay put order and reinstate the prior OAL stay put order, with some modification as we will explain.

**I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY**

The facts are well known to the parties and are thoroughly described in the papers docketed on this appeal. Therefore, we

give only the essential description of the facts and the procedural history of the case.

D.S. is a male student, currently age 16, who will turn age 17 during this current 2010-2011 academic year. (Verified Complaint, dkt. 1 ("Ver. Compl."), ¶ 2.) He exhibited developmental issues early in his life, and since second grade he has been diagnosed with Asperger's Syndrome, Attention Deficit Hyperactivity Disorder, and Central Auditory Processing Disorder. (Id. ¶ 8; Smith Aff., dkt. 1-8 ("Smith Aff."), ¶ 2.) He is eligible to receive special education and support services under the category of Autistic. (Ver. Compl. ¶ 4.)[1]

His local school district is the Branchburg Township Public School District ("Branchburg"). That school district educates its students through the elementary and middle school levels. When its students reach high school age they come under the administration of the Somerville Board of Education ("Somerville Board" or "Board"), through a sending and receiving relationship between Branchburg and the Somerville Board. (Id. ¶¶ 5-7.)

The nature of D.S.'s disability is such that his social interactions are often inappropriate. He was the object of emotional and physical abuse by his peers since first grade in the public school system, which escalated each year despite

---

[1] Diagnostic criteria for Asperger's Disorder are stated in the Diagnostic and Statistical Manual of Mental Disorders IV, Sec. 299.80. (See Pl. Br., dkt. 1-2, at 2-3.)

efforts by the parents and school authorities.  (Smith Aff. ¶¶ 4-7.)  He progressed through each grade year on schedule academically, but he experienced emotional torment and extremely low self esteem as the object of constant ridicule and bullying.  (Id.)  During the meeting for an Individualized Education Plan ("IEP") for D.S. at the end of fifth grade, his parents informed Branchburg that they had concluded that public placement in Branchburg was not appropriate.  Branchburg officials suggested that the parents allow him to proceed to sixth grade at the Branchburg Central Middle School, which was a bigger school with some new peers (some existing peers), and constant changing of classes.  (Id. ¶¶ 8-12.)  The parents consented, but the same peer situation quickly developed.  Thus, at the public middle school D.S.'s emotional condition further deteriorated, with resulting negative effects on his educational progress.  (Id. ¶ 13.)

A crisis point was reached in January of sixth grade, when a serious incident of peers physically attacking D.S. on the school bus was captured on a video security camera.  (Id. ¶ 14.)  The parents and the Branchburg child study team ("CST") then agreed that Branchburg Central Middle School was not an appropriate placement.  They spent the next month (February, 2006) mutually searching for an appropriate placement for him, initially with no success.  (Id. ¶¶ 15-17.)  As D.S.'s mother describes:

> A number of schools were considered for D.S.'s placement
> including but not limited to the Craig School, the

3

> Darcy School, and the Newark Academy.  The Craig School
> rejected D.S., the Darcy School only went to 8th grade
> so it did not make sense to make D.S. move two times,
> and the Newark Academy was full.  Some of the schools
> for children with special needs would not consider D.S.
> because he had an Asperger's Syndrome diagnosis.

(Id. ¶ 17.)

The parents located the Timothy Christian School as a possible placement.  It is an accredited private day school offering grades K through 12.  After a series of interviews and meetings, the parents and the Branchburg CST agreed that it would be an appropriate placement for D.S.  He was placed by Branchburg at the Timothy Christian School on March 13, 2006 (sixth grade, academic year 2005-2006).  His IEP was changed to reflect his new placement.  (Id. ¶¶ 18-20.)[2]  His IEP program placed him in regular classes, but with a full-time personal aide, supplemental tutoring, and behavioral consultation by a licensed Ph.D. behavioral therapist.  (Id. ¶ 20; Ver. Compl. ¶ 18.)  D.S. gradually made progress in the new placement.  (Smith Aff. ¶ 21.) Plaintiffs state that "Timothy Christian School's policy of acceptance and tolerance combined with therapeutic support has allowed D.S. to make social progress and educational progress." (Ver. Compl. ¶ 20; see also Smith Aff. ¶¶ 21-23.)

---

[2]  The IDEA goals are provided by designing and implementing a program of individualized instruction for each special education student, set forth in an IEP.  20 U.S.C. §§ 1412(a)(4), 1414(d). The IEP must be reviewed at least annually to determine whether the stated goals for the student are being achieved.  20 U.S.C. § 1414(d)(4).

An IEP meeting for upcoming academic year 2008-2009 was held on May 28, 2008, at the end of D.S.'s eighth grade year.  Those attending included the parents, D.S. himself, the Branchburg CST, and a representative of the Somerville Board because D.S. was reaching his high school years and it was the receiving district. (Smith Aff. ¶ 24.)  At the conclusion of that meeting there was general consensus and the parents and the responsible Branchburg official signed his IEP dated May 28, 2008.  (Id., Ex. E.)  That IEP provided a continuation of his existing placement and basically the same accommodations and support services as his prior IEPs since arriving at that placement.  (Id. ¶ 24.)  He has continued at the Timothy Christian School since then, receiving the same services, and is currently in eleventh grade, academic year 2010-2011.

Here is how the dispute arose.  On October 21, 2008, when D.S. had begun ninth grade, an official in the New Jersey Department of Education ("Department") directed a letter to the parents and to the respective Branchburg and Somerville school district officials.  (Smith Aff., Ex. G.)[3]  That letter referred to a provision of New Jersey law called the "Naples Act,"

_____

[3]  The title of the official who issued the October 21, 2008 letter was Executive County Superintendent, but the letterhead was that of the state Department of Education, thus indicating that the official was a state official rather than a Somerville Board official.  (Smith Aff., Ex. G.)  Nonetheless, Somerville Board has to date raised no objection to being named the defendant.

N.J.S.A. § 18A:46-14.  The Naples Act provides a procedure for school districts to obtain Department consent to place IDEA-eligible students in accredited nonpublic schools that are not specifically approved for education of handicapped children, if certain criteria are met.  One of those criteria is that the proposed school must be nonsectarian.  Id.  The October 21, 2008 letter stated in pertinent part as follows:

> As you all are aware shortly after assuming this office it came to my attention that one of our Somerset County students, specifically from the school district of Branchburg, was placed in March 2006 at the Timothy Christian School....
>
> Some investigation into this placement revealed that there was no NAPLES application submitted by the Branchburg School district to the [Department] as is required by law.
>
> ....  In September of 2008 this student began grade 9 and as such, responsibility for his case management was transferred to the Somerville Child Study Team.
>
> ....  I am going to outline my expectations for the actions that need to be taken to rectify this situation.
>
> The Somerville CST must visit this student at the Timothy Christian School and .... conduct a curriculum audit to determine and document the provision of religious instruction as part of DS's academic program.
>
> Upon completion of these activities the Somerville CST should conduct a review of possible new placement options for DS ..., with the highest priority given to a public school placement and/or a placement at Somerville High School.
>
> Then the Somerville CST should meet with the parents of DS for the purpose of determining an appropriate placement in the least restrictive environment in a non-sectarian school.
>
> ....  I expect that you will utilize the most aggressive timeliness for completion of these required activities.

(Smith Aff., Ex. G.)

6

The parents attended an IEP meeting with D.S.'s current Somerville CST on December 15, 2008, as requested by the Somerville Board.  At that meeting the parents were informed that his placement was being changed to Somerville High School, effective January 5, 2009.  (Id. ¶ 32.)  The parents requested and received an extension to respond until February 2, 2009, so that they could have a behavior analyst observe and assess the appropriateness of the proposed placement.  When they could not obtain those services on that schedule, they initiated administrative proceedings on January 29, 2009.  (Id. ¶¶ 32-34; Ver. Compl. ¶ 33.)

Administrative due process cases under IDEA are adjudicated in New Jersey by the OAL.  On February 18, 2009, the Somerville Board moved for emergent relief asking that D.S.'s stay put placement be changed from the Timothy Christian School to Somerville High School or to the neighboring South Hunterdon High School.  (Ver. Compl. ¶ 34.)  Administrative Law Judge ("ALJ") Hon. Douglas H. Hurd heard oral argument on March 10, 2009, and rendered an oral decision.  (Id. ¶ 35.)  He ruled that the Somerville Board had not met the four-prong test for emergent relief under N.J.A.C. § 6A:14-2.7(s), based on balancing the equities.[4]  He directed that the Timothy Christian School would

_____

[4]  In our view, N.J.A.C. § 6A:14-2.7(s) (injunctions) was not the correct citation or standard for analysis of the stay put issue in this case; however, the resulting order of March 10,

7

remain the stay put placement, despite the Somerville Board's "concern about taxpayer money going there."  This was on March 10, 2009, when D.S. was still in ninth grade.  (Callahan Decl., dkt. 1-7 ("Callahan Decl."), Ex. A at 19-20.)

The due process case proceeded in the OAL, and was reassigned to ALJ Hon. Donald J. Stein.  (Ver. Compl. ¶ 38.) Several hearing dates were scheduled and adjourned at the request of the parties.  On December 16, 2009, "the parties filed motions for summary decision before Judge Stein as to the issue of whether or not D.S. could remain legally placed at the Timothy Christian School by the BOARD."  (Id. ¶ 39.)

ALJ Stein rendered a written opinion on June 1, 2010. (Callahan Decl., Ex. B.)  He found there was no factual dispute that Timothy Christian School is a sectarian school.  He concluded that D.S. had been placed by the school districts at that school since 2006 in violation of the Naples Act, and since the school is a sectarian school it cannot be approved as a placement for D.S. under the Naples Act.  (Id. at 5.)[5]  ALJ Stein

_____

2009 correctly decided the issue in favor of maintaining the status quo placement (except for the funding mechanism problem that we addressed on this judicial appeal).  The correct New Jersey regulation governing stay put in this context was N.J.A.C. § 6A:14-2.7(u), which does not apply a balancing test.

[5]  ALJ Stein, in his June 1, 2010 decision, declined to reach the Somerville Board's further argument that placement of D.S. at Timothy Christian School cannot continue because it is a violation of the Establishment Clause.  (Callahan Decl., Ex. B at 5.)  We discuss that point infra, Sec. II.4. and II.5.

ordered that D.S.'s placement at Timothy Christian School "shall
terminate at the completion of the 2009-2010 school year."  (Id.)
He further ordered "that the District complete an IEP and
schedule a meeting within thirty days."  (Id. at 6.)

The Somerville Board held an IEP meeting for D.S. on June
17, 2010.  The Board's proposed placement for him for eleventh
grade, academic year 2010-2011, was again Somerville High School.
(Ver. Compl. ¶ 44.)

Plaintiffs initiated the action in this Court on August 16,
2010, with the filing of a Verified Complaint.  They applied
simultaneously for temporary restraints and a preliminary
injunction seeking to have D.S. stay put at Timothy Christian
School while the administrative due process case remains pending
in the OAL.  (Ver. Compl. at 9-11.)  Plaintiffs state that the
OAL case remains open, to adjudicate whether the proposed
placement at Somerville High School, or at South Hunterdon High
School, is appropriate for D.S.  (Id. ¶ 45.)  Plaintiffs also
contend that if the placements offered by Somerville are found
not to provide D.S. with a free and appropriate public education
("FAPE"), then a unilateral placement of D.S. by them at Timothy
Christian School should be approved for them to be reimbursed.
(See Plaintiffs' Reply Br., dkt. 7 ("Pl. Reply Br."), at 5, 9-11.)

Plaintiffs have obtained expert evaluations and other
evidence to present at the continued OAL proceedings.  Their

9

position is that to change D.S.'s placement from the current school at this time would have severely detrimental effects upon his educational progress that could not be remedied in his remaining high school years.  (Smith Aff. ¶¶ 35-39 and Exs. J-N.) The Somerville Board contends that its public high school will be an appropriate placement.  (Defendant's Br., dkt. 6 ("Def. Br."), at 23-25.)  The parents challenge that contention and seek an adjudication on these issues at the due process level.  (Pl. Reply Br. at 9-10.)  The parties recognize that either side may appeal the administrative ruling under IDEA.[6]

As soon as the action was brought and assigned here, we consulted with the parties and issued a scheduling order for briefing and oral argument.  (Order, dkt. 5.)  The parties complied, and oral argument was conducted on October 1, 2010, shortly after the 2010-2011 academic year commenced.  (Minute entry, dkt. 8.)

The Court was informed at oral argument that the Board had discontinued funding D.S.'s enrollment and supporting services at Timothy Christian School at end of the 2009-2010 school year, pursuant to the June 1, 2010 ALJ order.  When the eleventh grade school term started in September, 2010, while the matter was

---

[6]   Any party aggrieved by the final administrative decision may seek review of that decision in a state or federal court under the IDEA.  See 20 U.S.C. § 1415(i)(2).  The IDEA's stay put provision applies during such judicial proceedings.  See Drinker v. Colonial Sch. Dist., 78 F.3d 859, 868 n.16 (3d Cir. 1996).

being briefed for this Court, the parents began paying those costs weekly at their own expense despite their inability to afford the ongoing payments, so that D.S. could start school on time.

We ruled at oral argument that D.S. would remain at the Timothy Christian School, with all the supports and services listed in his last agreed-upon IEP, until the litigation is completed.  However, we modified the payment arrangement by ordering that the funds necessary to maintain that placement would be advanced by the parents and reimbursed to them on a monthly basis, so that the Somerville Board was no longer required to provide payment directly to the school.  An order reflecting that ruling was docketed on October 27, 2010.  (Dkt. 10.)  This Memorandum Opinion sets forth the findings and conclusions of the Court in support of that interlocutory injunctive order.  See Fed.R.Civ.P. 52(a)(2).

## II.  DISCUSSION

### 1.  IDEA Statutory Framework

The basic substantive and procedural requirements of the IDEA have been described in a well-developed body of case law. Here we quote a summary of that framework from a recent decision in this Circuit:

> The IDEA requires that states to receive federal education funding make available a free and appropriate public education to all children with disabilities residing within their borders.  20 U.S.C. § 1412(a)....
> Although a state is not required to supply an education to a handicapped child that maximizes the child's

potential, it must confer an education providing "significant learning" and "meaningful benefit" to the child....  In addition to establishing educational standards, the IDEA includes a "mainstreaming" component requiring the placement of a student with disabilities in the least restrictive environment that will provide the child with a meaningful educational benefit....

....

Though the IEP must provide the student with a "basic floor of opportunity," it need not necessarily provide "the optimal level of services" that parents might desire for their child....  Nevertheless, "at a minimum, '[t]he IEP must be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential.'" ....  When a state is unable to provide a free and appropriate public education to a child but a private school can provide that education, the state must reimburse the child's parents for the private school costs....

If parents believe that an IEP fails to provide their child with a free and appropriate public education, they may challenge the IEP in an administrative proceeding.  20 U.S.C. § 1415(b)(6)....  [I]f mediation is unsuccessful, there will be a "due process hearing" held before an ALJ to seek a resolution of their dispute....  A party to the due process hearing aggrieved by its outcome has the right to bring a civil action challenging the decision in any state court of competent jurisdiction or in a federal district court, without regard to the amount in controversy.  20 U.S.C. § 1415(i)(2).

D.S. v. Bayonne Bd. of Educ., 602 F.3d 553, 556-57 (3d Cir. 2010) (internal citations omitted).

The current dispute arises under the stay put provision of IDEA, 20 U.S.C. § 1415(j).  The provision was previously codified as 20 U.S.C. § 1415(e)(3), and was cited as such when in effect. See, e.g., Drinker, 78 F.3d at 864.  It is sometimes referred to as the pendent placement provision.  See, e.g., Susquenita Sch. Dist. v. Raelee S., 96 F.3d 78, 82 (3d Cir. 1996).  "The pendent

12

placement provision was included in the IDEA to protect handicapped children and their parents during the review process." Id.

The stay put provision states in pertinent part as follows:

> [D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child....

20 U.S.C. § 1415(j).

The Supreme Court has described the language of section 1415(e)(3) as "unequivocal," in that it states plainly that "'the child shall remain in the then current educational placement.'" Drinker, 78 F.3d at 864 (quoting Honig v. Doe, 484 U.S. 305, 323 (1988)). The function of the stay put is essentially a preliminary injunction issued without the necessity to establish the usual injunctive prerequisites:

> Section 1415(e)(3) of the IDEA functions, in essence, as an automatic preliminary injunction. Zvi D. v. Ambach, 694 F.2d 904, 906 (2d Cir. 1982). As the Court of Appeals for the Second Circuit has stated, "[t]he statute substitutes an absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fair ground for litigation and a balance of hardships." Id. (citations omitted).

Id.

"The provision represents Congress' policy choice that all handicapped children, regardless of whether their case is meritorious or not, are to remain in their current educational placement until the dispute with regard to their placement is ultimately resolved. Once a court ascertains the student's

13

current educational placement, the movants are entitled to an order without satisfaction of the usual prerequisites to injunctive relief....  The relevant inquiry under section 1415(e)(3) thus becomes the identification of 'the then current educational placement,' of the handicapped student and, further, the identification of who should pay for it."  Id. at 864-65 (citation omitted).

The Third Circuit has consistently reiterated that the purpose of the stay put provision is the preservation of the status quo during disputes about a child's educational placement. See, e.g., Pardini v. Allegheny Intermediate Unit, 420 F.3d 181, 190 (3d Cir. 2005); J.O. v. Orange Twp. Bd. of Educ., 287 F.3d 267, 272 (3d Cir. 2002).  The test for determining the current educational placement is "the operative placement actually functioning at the time the dispute first arises."  Drinker, 78 F.3d at 867.  This test, as adopted and explained in our Circuit, is as follows:

> Because the term connotes preservation of the status quo, it refers to the operative placement actually functioning at the time the dispute first arises.  If an IEP has been implemented, then that program's placement will be the one subject to the stayput provision.  And where ... the dispute arises before any IEP has been implemented, the 'current educational placement' will be the operative placement under which the child is actually receiving instruction at the time the dispute arises.

Id. (quoting Thomas v. Cincinnati Bd. of Educ., 918 F.2d 618, 625-26 (6th Cir. 1990)).

Once the current educational placement is determined, the school district must continue to finance that placement so that the status quo is maintained during the litigation.  "[I]mplicit in the maintenance of the status quo is the requirement that a school district continue to finance an educational placement made by the agency and consented to by the parent before the parent requested a due process hearing.  To cut off public funds would amount to a unilateral change in placement, prohibited by the Act."  Id. at 865 (quoting Zvi D., 694 F.2d at 906).  For example, when ruling that the operative placement school had been correctly identified in Drinker, the Court of Appeals concluded that "the district court was correct in its decision that [school district] must bear the burden of paying for the costs of [student]'s education at [that school] through the date of the district court's final order."  Id. at 867 (citation omitted).

## 2.  Jurisdiction and Standard of Review

The District Court has jurisdiction of this matter under 28 U.S.C. § 1331 (federal subject matter jurisdiction).  The IDEA also contains an express grant of jurisdiction for a district court to review a final decision of the administrative due process proceeding.  See 20 U.S.C. § 1415(i).  The stay put provision has no express language authorizing appeal to the district court.  20 U.S.C. § 1415(j).  Our courts, however, accept jurisdiction of stay put disputes, and the Court of Appeals has expressed no

concern about the jurisdictional basis.  See, e.g., Drinker, 78 F.3d at 860 (stay put and substantive IEP issues were consolidated and received final administrative order, then district court consolidated both sets of issues before ruling; jurisdiction was proper under 20 U.S.C. § 1415(e)(4)(A), currently codified at 20 U.S.C. § 1415(i)); Pardini, 420 F.3d at 192 n.13 (exhaustion of administrative process not required because stay put issue, "interpretation of § 1415(j) -- is a purely legal one.").

When deciding an IDEA case, in general, the district court applies a modified version of de novo review and is required to give due weight to the factual findings of the ALJ.  L.E. v. Ramsey Bd. of Educ., 435 F.3d 384, 389 (3d Cir. 2006) (citations omitted).  "Under this standard, '[f]actual findings from the administrative proceedings are to be considered prima facie correct,' and '[if] a reviewing court fails to adhere to them, it is obliged to explain why.'"  Shore Req'l High Sch. Bd. of Educ. v. P.S., 381 F.3d 194, 199 (3d Cir. 2004) (quoting S.H. v. State-Operated Sch. Dist. of City of Newark, 336 F.3d 260, 271 (3d Cir. 2003)).  On the other hand, the question of what constitutes a student's "current educational placement" under IDEA's stay put provision is one of law.  See Drinker, 78 F.3d at 865 ("[W]e must determine if [specified school] indeed qualified as [student's] 'then current educational placement' during the pendency of the parents' second round of hearing officer and appeals panel review

16

and until the time that the district court ruled.  Our review of
this <u>legal</u> issue is plenary.") (emphasis added; citations and
footnote omitted).[7]

    Not only is a stay put decision a legal question as
established in the case law, but here the historical facts are
not in dispute.  The record is clear as to how D.S. was placed at
his current school since sixth grade, and how he remains there to
date.  Therefore, we consider that the stay put questions
presented to this Court on this interlocutory appeal are legal
issues, so our review of the ALJ stay put decision is de novo.
<u>Drinker</u>, 78 F.3d at 867.  To the degree that we have fashioned

---

    [7]  We note that the issue of who bears the burden of proof on
the appropriateness of a proposed IEP placement has been in flux.
When <u>L.E.</u> was decided in 2006, the Third Circuit observed that the
Supreme Court held in <u>Schaffer v. Weast</u>, 546 U.S. 49 (2005), that
"the burden of proof in an administrative hearing challenging an
IEP is properly placed upon the party seeking relief." <u>L.E.</u>, 435
F.3d at 391 (quoting <u>Schaffer</u>, 546 U.S. at 62).  However, the
<u>Schaffer</u> Court declined to address the issue of whether a state
could, by statute, place the burden exclusively upon the school
district. <u>Id.</u>  New Jersey did later enact legislation placing
the burdens of proof and production upon the school district in
IDEA due process hearings, applicable to hearings requested after
January 13, 2008.  N.J.S.A. § 18A:46-1.1.  <u>See</u> <u>D.S.</u>, 602 F.3d
553, 558 n.2.  The due process proceedings in the instant case
were initiated on January 29, 2009, after the effective date of
that law.  Therefore, it appears that the school district has the
burden of proof on factual issues regarding its proposed IEPs in
the ongoing due process proceedings in the OAL.  We assume, but
find no current authority in the Third Circuit, that the parents
seeking approval of a unilateral parental placement would have
the burden of proving their entitlement to that relief.  <u>See,
e.g.,</u> <u>Shore Reg'l</u>, 381 F.3d at 199 ("If the IEP did not provide a
FAPE, the District Court must then decide whether the parents
took appropriate actions.")

relief by imposing an order modifying the payment arrangement for
continuation of the stay put placement, this Court has made its
own legal determinations and exercises its own equitable
authority.  See Sch. Comm. of Burlington v. Dep't of Educ. of
Mass., 471 U.S. 359, 369-74 (1985), and discussion infra Sec. II.5.

### 3.  New Jersey Statute:  Naples Act

New Jersey has enacted legislation and issued regulations,
consistent with the IDEA, that govern placement of disabled
students.  N.J.S.A. § 18A:46-14 governs the types of facilities
and programs that may be selected for such education.  Generally,
students with disabilities requiring special education may only
be placed in facilities that are approved for the education of
disabled students.  N.J.S.A. § 18A:46-14.  However, under
circumstances where it is determined that there is no approved
public school that can provide adequate services to the student,
he or she may be placed in a non-approved (that is, not approved
for education of disabled students) nonpublic school.  N.J.S.A. §
18A:46-14(h).  This mechanism for placement is known in New
Jersey as the Naples Act or the Naples Amendment.  See L.M. v.
Evesham Twp. Bd. of Educ., 256 F.Supp.2d 290, 294 (D.N.J. 2003).

The Naples Act permits the Commissioner of Education to
approve placement of a child in a non-approved nonpublic school
when a suitable special education program cannot be provided by
the local school district.  Id.  The implementing regulations

specify that the private school must meet certain conditions, including that the school must be fully accredited, its teaching staff must be appropriately certified, it must comply with state and federal anti-discrimination statutes, and it must be nonsectarian.  N.J.A.C. § 6A:14-6.5(b).[8]

Use of the Naples Act for placement of a student in a private non-approved school is only an available resource for school districts, rather than parents, when more conventional placements are not available for the child in question and the school district remains obligated to provide the child with a

---

[8]  The IDEA directly addresses private school placement by public agencies as follows:

(B)  Children placed in, or referred to, private schools by public agencies
     (i)  In general
       Children with disabilities in private schools and facilities are provided special education and related services, in accordance with an individualized education program, at no cost to their parents, if such children are placed in, or referred to, such schools or facilities by the State or appropriate local educational agency as the means of carrying out the requirements of this subchapter or any other applicable law requiring the provision of special education and related services to all children with disabilities within such State.
     (ii)  Standards
       In all cases described in clause (i), the State educational agency shall determine whether such schools and facilities meet standards that apply to State educational agencies and local educational agencies and that children so served have all the rights the children would have if served by such agencies.

20 U.S.C. § 1412(a)(10)(B).

FAPE.  L.M., 256 F.Supp.2d at 302.  This distinction is apparent because the regulation requires that the school district must give notice to the parents of the proposed placement, and the parents do not contest the placement.  N.J.A.C. § 6A:14-6.5(b)(9)-(10); see H.W. v. Greater Brunswick Charter Sch., No. EDS-905-00, 2001 WL 1023471 (N.J. Adm. Aug. 28, 2001).

The placement of D.S. at Timothy Christian School in sixth grade was made by Branchburg, the local K-8 school district, with the consent of the parents.  It was a mutual decision reached after both sides determined that the public school could not provide D.S. with a FAPE, and no other suitable schools had been found for him.  In those aspects the placement met the criteria of the Naples Act.

The placement diverged from the Naples Act, however, in two critical ways.  First, as has now been acknowledged by all, Timothy Christian School is sectarian in both name and reality.  Second, although Branchburg may have initiated the paperwork to obtain approval of the Commissioner, the process was never completed and the Commissioner never approved the placement.  That was the anomalous situation confronted by the Commissioner and the Somerville Board at the time D.S. reached high school age, and the Somerville Board became the receiving school district for students from Branchburg.  (Smith Aff., Exs. D, G.)

20

### 4.   Law Governing Unilateral Parental Placements

The placement of D.S. at Timothy Christian School in 2006 was not a unilateral parental placement.  Rather, it was a mutually agreed placement that was embodied in his IEP in each year until this dispute arose in 2008.  Nevertheless, there are certain principles governing unilateral parental placements that we have considered in deciding this interlocutory appeal under the IDEA stay put provision.  That body of law is summarized briefly here.

It is well settled that parents are free to withdraw their child from a school district without the consent of state or local officials and place the child in a private, non-approved school when they are dissatisfied with a school district's proposed IEP. Parents are entitled to reimbursement for the cost of unilateral placement if (1) the school district has failed to provide a FAPE, and (2) the placement chosen by the parents is proper. Burlington, 471 U.S. at 369-73; 20 U.S.C. § 1412(a)(10)(C)(ii).

The Supreme Court has ruled that parents are entitled to reimbursement even if the unilateral placement does not meet all of the requirements of a FAPE as defined by IDEA, including state approval and public supervision and direction.[9]  Florence Cnty.

---

[9]  The IDEA defines a FAPE as follows:

(9)  Free appropriate public education
       The term "free appropriate public education" means
       special education and related services that --
       (A)  have been proved at public expense, under public
            supervision and direction, and without charge;

Sch. Dist. Four v. Carter, 510 U.S. 7, 15 (1993).  "Florence gives parents the right to reimbursement for a unilateral placement in a non-qualifying school only 'if a federal court concludes both that the public placement violated IDEA and that the private school placement was proper under the Act.' ....  By its terms, this is a two-pronged inquiry."  T.R. v. Kingwood Twp. Bd. of Educ., 205 F.3d 572, 582 (3d Cir. 2000) (quoting Florence, 510 U.S. at 15).

The second prong of this inquiry requires specifically that the private school selected by the parents must be "proper under the Act."  Burlington, 471 U.S. at 370; Florence, 510 U.S. at 12, 15.  This is an apparent reference to the substantive standard for an "appropriate" education set forth in Board of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley, 458 U.S. 176 (1982).  In Rowley, the Supreme Court construed the IDEA's FAPE mandate to require "education specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction."  Id. at 188-89.  See T.R., 205 F.3d at 577.

---

> (B)   meet the standards of the State educational
>        agency;
> (C)   include an appropriate preschool, elementary
>        school, or secondary school education in the State
>        involved; and
> (D)   are provided in conformity with the individualized
>        education program required under section 141(d) of
>        this title.

20 U.S.C. § 1401(9) (formerly codified as 20 U.S.C. § 1401(a)(18), and 20 U.S.C. § 1401(8)).

The private school selected by the parents does not, however, have to meet any of the state education standards imposed by IDEA and state laws and regulations.  Florence, 510 U.S. at 13-14.

It has been emphasized that while the parents can seek reimbursement for a unilateral placement, the state is not at liberty to place a student in a facility that lacks state approval:

> Florence, while holding that parents are not bound by § 1401(a)(18)(B)'s state standards requirement, did not suggest that the state is required -- or even permitted -- to overlook that statutory mandate and consider placements that do not meet its substantive educational standards.  Such a reading would go against the plain language of the statute and render the state standards requirement of § 1401(a)(18)(D) a nullity.

T.R., 205 F.3d at 582.

Careful analysis by one of our colleagues has concluded that if the parents make a unilateral placement that does satisfy the Florence two-prong test, and the school selected by the parents is sectarian, neither the IDEA nor the Establishment Clause is violated when the court orders reimbursement to the parents.  See L.M., 256 F.Supp.2d at 295-98, 302-05.  Further, in such a situation New Jersey's Naples Act is not violated because the placement is not made by the state educational agencies.  Id. at 298-302.  We agree with the thoughtful and thorough analysis in L.M. and consider it to be an accurate statement of the law on these points.

23

### 5.    Findings and Conclusions

The sole question before this Court is whether, under the IDEA stay put provision, 20 U.S.C. § 1415(j), this Court should order that D.S. remain at the Timothy Christian School ("TCS") until the completion of the pending administrative proceedings and a judicial appeal from those proceedings in this or state court.  The Verified Complaint in this Court seeks only that injunctive relief, which we have granted.

Plaintiffs sought in the current appeal only a partial reversal of the June 1, 2010 order of the ALJ, to reinstate and maintain the status quo of the placement of the student pendente lite.  (Ver. Compl. at 9-11.)  That is the limited relief that we have granted, with a modification explained below.

This Court has not been asked to review, in this interlocutory appeal, the June 1, 2010 substantive ruling of the ALJ that the Board could not and can not legally place a student at a sectarian school such as TCS under the Naples Act.  We assume that all parties preserve their rights to argue that issue, and all other issues yet to be resolved, on appeal of any final ruling of the ALJ in the pending due process proceedings.

We find that under the undisputed facts in the record, TCS is the stay put placement of the student.  We will call it the Stay Put Placement for purposes of this ruling.  It was the approved placement in the 2008-2009 IEP signed by the parties.

(Smith Aff., Ex. E.)  It is where D.S. has been educated continuously since his original placement there by Branchburg in 2006, in the middle of his sixth grade year.  (Id. ¶ 20.)

This dispute arose in the Fall of 2008, when D.S. was actually attending TCS as a high school ninth grader under that placement. (Id. ¶¶ 25-30.)  It is clear and we so find, that TCS was "the operative placement actually functioning at the time the dispute first [arose]."  Drinker, 78 F.3d at 867.  We therefore conclude that it must remain the Stay Put Placement until the entire case is resolved either by agreement or further litigation.  Id.

The IDEA stay put law and regulations admit of only two exceptions where it is the Board, rather than the parents, seeking to change the operative placement during the litigation. The first is where the parents agree with the change of placement.  20 U.S.C. § 1415(j).  The second exception arises under the disciplinary provisions of IDEA, 20 U.S.C. § 1415(k). Id.  Clearly, neither exception applies here, and no party argued otherwise.

Where, as here, neither exception applies, the language of the stay put provision is "unequivocal."  Honig, 484 U.S. at 323. It functions as an "automatic preliminary injunction," substituting "an absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fair

25

ground for litigation and a balance of hardships." <u>Drinker</u>, 78

F.3d at 864 (quoting <u>Zvi D.</u>, 694 F.2d at 906).

The fact that school years come and go while the litigation

is pending, and successive due process petitions may be filed

addressing the same dispute in each school year, does not obviate

the injunctive effect of the stay put provision as interpreted in

our courts.  As the Supreme Court observed in <u>Burlington</u>:

> [T]he review process is ponderous.  A final judicial
> decision on the merits of an IEP will in most instances
> come a year or more after the school term covered by
> that IEP has passed.  In the meantime, the parents who
> disagree with the proposed IEP are faced with a choice:
> go along with the IEP to the detriment of their child
> if it turns out to be inappropriate or pay for what
> they consider to be the appropriate placement.  If they
> choose the later course ... it would be an empty
> victory to have a court tell them several years later
> that they were right but that these expenses could not
> in a proper case be reimbursed by the school officials.

<u>Burlington</u>, 471 U.S. at 370.

Thus, the protestations by the Somerville Board, true as

they seem to be -- that at the time D.S. was originally placed at

TCS by Branchburg in 2006, (1) it was a mistake; (2) the

Somerville Board had no notion and indeed was not even there; and

(3) that even when both the Branchburg and Somerville Boards

apparently approved the 2008-2009 IEP, they only later found out

that they had made a mistake -- are unavailing under IDEA's stay

put provision.  Perhaps the IDEA should be amended to include

26

such exceptions, but they are not in the statute as written.[10]

---

[10]   The following classic exchange from Gilbert & Sullivan's
The Mikado comes to mind:

MIKADO ("MIK.")   (*Looking at paper*).   Dear, dear, dear!
this is very tiresome.   (*To* KO-KO.)   My poor fellow, in your
anxiety to carry out my wishes you have beheaded the heir to the
throne of Japan!
KO-KO ("KO.")   I beg to offer an unqualified apology.
POOH-BAH ("POOH.")   I desire to associate myself with that
expression of regret.
PITTI-SING ("PITTI.")   We really hadn't the least notion --
MIK.   Of course you hadn't.   How could you?   Come, come, my
good fellow, don't distress yourself -- it was no fault of yours.
If a man of exalted rank chooses to disguise himself as a Second
Trombone, he must take the consequences.   It really distresses me
to see you take on so.   I've no doubt he thoroughly deserved all
he got.   (*They rise.*)
KO.   We are infinitely obliged to your Majesty --
PITTI.   Much obliged, your Majesty.
POOH.   Very much obliged, your Majesty.
MIK.   Obliged?   not a bit.   Don't mention it.   How *could* you
tell?
POOH.   No, of course, we couldn't tell who the gentleman
really was.
PITTI.   It wasn't written on his forehead, you know.
....
MIK.   Ha!   ha!   ha!   (*To* KATISHA.)   I forget the punishment
for compassing the death of the Heir Apparent.
KO.
POOH.
PITTI.     [Together]:   Punishment.   (*They drop down on their
knees again.*)
MIK.   Yes.   Something lingering, with boiling oil in it, I
fancy.   Something of that sort....   Come, come, don't fret -- I'm
not a bit angry.
KO.   (*in abject terror*).   If your Majesty will accept our
assurance, we had no idea --
MIK.   Of course --
PITTI.   I knew nothing about it.
POOH.   I wasn't there.
MIK.   That's the pathetic part of it.   Unfortunately, the
fool of an Act says "compassing the death of the Heir Apparent."
There's not a word about a mistake --
KO., PITTI. *and* POOH.   No!
MIK.   Or not knowing --

We do note, however, that the Naples Act ruling of the ALJ appears to be correct under the facts and the law as described in the June 1, 2010 ALJ opinion.  (Callahan Decl., Ex. B.)  We also share the deeper concern of the Board and indeed the parents, that a Board placement of D.S. at a sectarian school may offend the Establishment Clause.  See Sec. II.4. supra.

For these reasons, in ruling upon this interlocutory stay put appeal, we have exercised the equitable authority of this Court and modified the payment method pendente lite, so that the parents are to be reimbursed for the costs that the Board cannot pay directly to the school.  In this way, the Stay Put Placement is imposed by court order rather than by any Naples Act decision the state might make.  Also, at least for the duration of the litigation, the Establishment Clause and the IDEA stay put

---

KO.  No!
MIK.  Or having no notion --
PITTI.  No!
MIK.  Or not being there --
POOH.  No!
MIK.  There should be, of course --
KO., PITTI. and POOH.  Yes!
MIK.  But there isn't.
KO., PITTI, and POOH.  Oh!
MIK.  That's the slovenly way in which these Acts are always drawn.  However, cheer up, it'll be all right.  I'll have it altered next session.  Now, let's see about your execution -- will after luncheon suit you?  Can you wait til then?
KO., PITTI. and POOH.  Oh, yes -- we can wait till then!
MIK.  Then we'll make it after luncheon.
POOH.  I don't want any lunch.

W.S. Gilbert, The Mikado, act II, in The Complete Operas of W.S. Gilbert 388-89 (Dorset Press 1932).

requirements are harmonized without conflict, by modification of
the payment obligations to not require direct payment by the
Board to support a sectarian school.

The remaining issues to be litigated, in the due process
proceedings and any judicial appeal, are serious and substantial
in our view.  The issues are not simply whether the Board can
place D.S. in a sectarian school such as TCS as his FAPE
placement.  That, indeed, appears to be foreclosed by both the
Naples Act and the Establishment Clause; although we refrain from
so ruling at this stage in the litigation.

The real issues at this juncture, as we see them, are:  (1)
whether the Board can meet its burden of establishing that the
placement(s) and programs it proposes ("Board Placement") will
provide D.S. with a FAPE; (2) whether the Board can establish
that any timing and transitional plan it proposes, to effect the
transition from TCS to a designated Board Placement, will provide
D.S. with a FAPE;[11] and (3) if either of those rulings is in the

_____

[11]   The <u>Drinker</u> court emphasized that even if a placement
dispute is theoretically resolved in favor of a school district,
important issues of transition and timing can affect the outcome:

> [School district] makes the conceptual mistake of
> separately cabining the issues of placement and
> transition, concepts that cannot be so radically
> separated.  While it is true that the Drinkers
> acquiesced in [prior ALJ]'s placement decision, that
> decision included, as part and parcel of the plan, a
> nearly one-year transition program for [student].  In
> contrast, the appeal decision ... aimed to place [him]
> at [district placement] ... with barely a three-week

negative, then whether the parents can establish that TCS as a unilateral parental placement would satisfy the minimal standards of "proper" under <u>Florence</u> and <u>Rowley</u>. <u>See</u> Sec. II.4, <u>supra</u>.

We offer these final observations in concluding this opinion. As stated at the outset, the circumstances here are unusual. We have found, and the parties have cited, no precedent presenting facts such as this.

Here, it appears that an official school district placement into a sectarian school was made and continued unchallenged for several years. During those years the student made a slow and difficult, but ultimately successful, transition to the new placement and made academic progress. When the legal error was discovered by the school district (actually, the successor school district and the state Department of Education), they attempted to switch the placement back to public school, but the matter went into due process proceedings initiated by the parents to maintain the status quo until the placement and, if necessary, transition issues could be addressed. By the time the dispute arrived in

─────────────────

transition period. Transition periods and timing of placement are integral elements of any educational program, elements that were not settled by any stretch of the imagination.... Thus, [second ALJ]'s placement decision, though settling the issue of where [student] ultimately would be placed, had <u>not</u> settled the timing and transition issues, since those elements were contested hotly through the time of the ... decision of the district court.

<u>Drinker</u>, 78 F.3d at 866.

this Court on interlocutory appeal limited to stay put issues, an ALJ decision had lifted the prior stay put order of an earlier ALJ, and the Board had discontinued funding the operative placement.

This Court has ruled that the current operative placement, which has continued without interruption from sixth grade to what is now the middle of eleventh grade, is the Stay Put Placement in this case.  That leaves yet to be decided whether the Board can offer a Board Placement, with appropriate transition plan and timetable, and if not, whether the parents are entitled to be reimbursed on an ongoing basis for a unilateral parental placement to maintain the student at TCS until he reaches graduation at the end of the coming academic year.  Those issues are properly before the ALJ in the ongoing proceedings.

It is significant that given this unusual set of circumstances, our order establishing the Stay Put Placement was imposed at a time when the Board had discontinued paying TCS directly for D.S.'s tuition and related services, based upon the concern of the Board that to pay directly would be illegal.  Out of respect for that position advanced by the Board, our order modifying the payment protocol has alleviated that concern pendente lite.  In that sense, the current status quo resembles a unilateral parental placement in effect, although it is legally a Stay Put Placement until the litigation is resolved by further adjudication or by mutual agreement of the parties.  For that

reason, we believe that the Board is under no obligation to supervise or coordinate with the administration or staff of TCS while this stay put order is in place.  See Florence, 510 U.S. at 13 ("[W]here the private placement has necessarily been made over the school district's objection, the private school education will not be under 'public supervision and direction.'")  It must always be borne in mind, however, that "the stay-put provision was never intended to suspend or otherwise frustrate the ongoing cooperation of parents and the school district to reach an amenable resolution of a disagreement over educational services." C.H. V. Cape Henlopen Sch. Dist., 606 F.3d 59, 72 (3d Cir. 2010).

This Memorandum Opinion accompanies the Order entered on October 27, 2010.  (Dkt. 10.)  An order administratively terminating this case is filed herewith.

        s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

Dated:  January 4, 2011